UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No.: 4:13-cr-410-CEJ |
| ) | |
| NAVEEP S. SANDHU, ) | |
| ) | |
| Defendant. ) | |

**SENTENCING MEMORANDUM**

COMES NOW Defendant, Naveep S. Sandhu ("Ms. Sandhu"), by and through counsel, and files the following memorandum for sentencing:

**I.      Background**

Ms. Sandhu agreed to plead guilty on May 26, 2015,[1] to two counts of Delivery of Adulterated Drugs in violation of 21 U.S.C. § 331(a), 21 U.S.C. § 333(a)(2), 21 U.S.C. § 351(a)(2)(B), and 18 U.S.C. § 2.  *See* Presentence Investigation Report at ¶ 1 [hereinafter "PSR"].  She will do so pursuant to a written agreement.  *See id.* at ¶ 2.  In the agreement the parties estimated a total offense level of 17 and agreed that the two counts should be grouped as a single count for sentencing purposes under U.S.S.G. §§ 3D1.1(a)(1) and 3D1.2(b).  *See id.* at ¶ 3, 8.  The parties agreed that Ms. Sandhu's base offense level of six is increased by 14 levels due to Special Offense Characteristics detailed in Sections 2B1.1(D), 2B1.1(b)(2)(A)(ii), 2B1.1(b)(10)(C), 2B1.1(b)(15) and 3C1.1 of the U.S. Sentencing Guidelines Manual [hereinafter "U.S.S.G."], then reduced by three levels for acceptance of responsibility.  *See id.* at ¶¶ 3-6.  The PSR reflects the same calculations, with an advisory guidelines range of 24 to 30 months.  *See id.* at ¶¶ 40-51, 81.  For the reasons detailed below, a sentence that minimizes Ms. Sandhu's time of incarceration will best serve the purposes of

---

[1] This date was continued by joint motion of the parties to August 3, 2015 [Doc. 30].

sentencing, the mandate at 18 U.S.C. §3553(a), and the individualized form of sentencing envisioned by *Booker*, than will any other sentence available to this Court.

## II. Sentencing Rules

Title 18 U.S.C. § 3553(a) requires this Court to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of sentencing. There are four purposes of sentencing[2] and six factors to consider in connection with them.[3] The guidelines are only one factor to consider, *see Kimbrough v. United States*, 552 U.S. 85, 90 (2007), and deserve no greater weight than any other factor. *Id*. Consistent with these rules, this Court may not presume a sentence within the guideline range reasonable. *See Rita v. United States*, 551 U.S. 338, 351 (2007). Nor may it presume unreasonable a sentence outside the guideline range. *See Gall v. United States*, 552 U.S. 38, 51 (2007). Likewise, this Court may not require "extraordinary circumstances" to justify a sentence different from that which the guidelines advise or "use a rigid mathematical formula to determin[e] the strength of the justification required for a specific sentence." *Id*. at 47. These rules apply whether the

---

[2] The purposes of sentencing are:

(A) to reflect the seriousness of the offense; to promote respect for the law; and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with the needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. §3553(a)(2)(A)-(D).

[3] The six factors to consider in connection with the purposes of sentencing are:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the kinds of sentences available;
(3) the guidelines promulgated by the Sentencing Commission;
(4) any pertinent policy statement issued by the Sentencing Commission;
(5) the need to avoid unwarranted sentencing disparities among similarly situated defendants; and
(6) the need to provide restitution to the victims.

18 U.S.C. §3553(a)(1)-(7).

2

guideline derives from the expertise of the United States Sentencing Commission ("the Commission") or a policy determination of Congress.  *See Kimbrough*, 552 U.S. at 109-110.

### III.     The Nature and Circumstances of Ms. Sandhu's Offense

Ms. Naveep Sandhu, a Canadian citizen, worked for her sister, co-defendant Kamaldeep Sandhu, as an employee at two related Canadian companies, Panacea and "onlinebotox.com."  *See* PSR at ¶ 17.  Through these two companies, Ms. Sandhu and her sister distributed unapproved, adulterated, misbranded, and counterfeit prescription drugs to purchasers in the United States, including purchasers in the Eastern District of Missouri.  *See id*. at ¶ 17, 21.  Ms. Sandhu promptly demonstrated acceptance of responsibility for the offense and provided a truthful admission regarding her involvement in the instant offense.  *See id.* at ¶ 36.  The PSR reflects that the government has determined Naveep Sandhu's culpability for these offenses to be the lower than any of the other defendants involved in the sale and delivery of adulterated prescription drugs, because she worked at the direction of her sister, but greater than two identified purchasers of the drugs.  *See id.* at ¶ 32.

### IV.     Sandhu's History and Characteristics

Naveep Sandhu, now 31 years old, is one of three daughters born to a farming family in India.  *See id.* at ¶ 58.  In 1991, when Ms. Sandhu was seven years old, her father, grandfather and uncle were murdered in front of her home.  *See id.*  Shortly afterward, she immigrated with her mother and sister to Canada, where her older sister already lived.  *See id.*

Ms. Sandhu married Ravinder Sangha on October 23, 2002, in Punjab, India.  *See id.* at ¶ 59.  It was an arranged marriage, and the two had not met prior to marrying.  *See id.*  They resided in Canada, where Ravinder worked as a truck driver, and they had a son together who is now five years old.  *See id.*  However, it was an unhappy marriage, and the two divorced last year after separating in 2011.  *See id.*  Ms. Sandhu maintains custody of her son, and

Ravinder does not pay child support to Ms. Sandhu although he has monthly contact with his son. *See id.*

Ms. Sandhu graduated from Killarney Secondary High School in Vancouver, British Columbia, in 2002. *See id.* at ¶ 66. She obtained an Associate's Degree in freelance makeup in 2009 and another Associate's Degree in esthetics and spa therapy in 2011 from the Blanche MacDonald Centre in Vancouver. *See id.* at ¶ 67. Following her employment at Panacea and onlinebotox.com, Ms. Sandhu worked as a pharmacist assistant at Costless Pharmacy, which closed in March 2015, and she is currently working part-time as a cashier at Sephora, a retail beauty supply store in Vancouver. *See id.* at ¶¶ 71-73.

Ms. Sandhu has no history of mental health conditions or substance abuse. *See id.* at ¶¶ 64-65. She has been in a relationship with Samuel Sladich, a 31 year-old power engineer residing in British Columbia, since 2011. *See id.* at ¶ 60. She recently gave birth to their child on July 10, 2015. Ms. Sandhu currently lives with her son, mother, and sister in Vancouver, and her plans to move in with Samuel are on hold pending the outcome of this case. *See id.*

> **V. Ms. Sandhu's Care for a Newborn and Her Status as the Primary Caregiver for Another Minor Child Indicate That a Sentence of Probation, or a Sentence Substantially Below the Guideline Range, Will Best Serve the Purposes of Sentencing**

The Sentencing Guidelines do allow extraordinary family circumstances to be taken into account in determining whether a downward departure is appropriate and reasonable in a particular case, even though family circumstances are "not ordinarily relevant." U.S.S.G. § 5H1.6; *United States v. Pena*, 930 F.2d 1486, 1495 (10th Cir. 1991) (in a pre-*Booker* case, holding that "there may be extraordinary circumstances where family ties and responsibilities may be relevant to the sentencing decision"). In fashioning a "sentence sufficient, but not greater than necessary," to meet the purposes of sentencing, 18 U.S.C. § 3553(a), "district courts are not only permitted, but required, to consider 'the history and characteristics of the

4

defendant.'" *United States v. White*, 506 F.3d 635, 643 (8th Cir.2007) (quoting 18 U.S.C. § 3553(a)(1)).

Courts have long considered a defendant's responsibilities for caring for family members as well as a defendant's current pregnancy or infant child's needs in sentencing under the Guidelines. *See Pena*, 930 F.2d at 1495 (finding downward departure to sentence of probation with special condition that defendant serve six months in a community treatment center reasonable where defendant was primary caregiver and sole financial support for her two-month old infant, and also supported her 16 year-old daughter who herself had a two month-old infant); *United States v. Pokuaa*, 782 F. Supp. 747, 747-48 (E.D.N.Y. Jan. 31, 1992) (finding downward departure and a sentence of time served justified where defendant, a citizen of Ghana, was seven months pregnant at the time of sentencing, incarceration posed a serious health risk to her and her unborn child, and she risked losing parental rights to her child if incarcerated for up to two years after the child's birth).

Courts have likewise recognized the defendant's status as a primary care giver as a potential mitigating factor warranting departure or downward variance from the sentencing guidelines. *See, e.g, U.S. v. Munoz-Nava*, 524 F.3d 1137 (10th Cir. 2008) (sentence of 1 year and 1 day for a man who possessed with intent to distribute 100 grams of heroin, despite a guideline range of 46-57 months, based on his long work career, community support, lack of a criminal record, and responsibilities as sole supporter of 8-year-old son and elderly parents, which reduced the likelihood he would re-offend). Courts especially consider a defendant's circumstance as the primary care giver of a young child whose presence is essential to the child's development. *See, e.g.*, *United States v. Lehmann*, 513 F.3d 805 (8th Cir. 2008) (affirming a downward variance to probation where a prison sentence would have negatively affected the defendant's disabled nine year old son because despite father's involvement in son's life, defendant was in a better position to provide the child care and support); *United*

5

*States v. Haidley*, 400 F.3d 642, 645 (8th Cir. 2005) (family circumstances, including two young children at home, may be considered under § 35539(a)); *U.S. v. Antonakopoulos*, 399 F.3d 68 (1st Cir. 2005) (on remand of bank fraud case, district court may consider defendant's role as caretaker for brain-damaged son even though alternative means of care existed); *U.S. v. Aguirre*, 214 F.3d 1122 (9th Cir. 2000) (district court had discretion to depart downward 4 levels for extraordinary family circumstance that defendant's 8-year old son had lost his father and would be losing his mother, his primary care giver for substantial amount of time); *U.S. v. Crocker*, 2007 WL 2757130 (D. Kan. Sept. 30, 2007) (Downward variance granted based on advisory Guidelines and several factors including defendant's responsibilities as a parent).

In this case, Ms. Sandhu is responsible for the care and support of a newborn and a five year-old son, both of whom are citizens of Canada and reside in Vancouver. The five-year old's father has no custody rights and provides no support for the child, and only has contact with the child once a month. If Ms. Sandhu is incarcerated in a federal facility, she would likely lose the ability to have visitation and maintain contact with her son, given the fact that he lives in Vancouver and the substantial distance between Vancouver and any BOP facility other than a Residential Re-entry Management Facility. The detriment to the child that would result from his separation from his mother during incarceration can be taken into account by the court as a factor in sentencing. *See United States v. Greer*, 375 F. Supp. 2d 790, 794-95 (E.D. Wis. June 27, 2005) (considering effect of defendant's possible incarceration on her young children and her unborn child in determining that a sentence of no incarceration was appropriate, even though the guidelines suggested a sentence of 46-48 months); *see also Pena*, 930 F.2d at 1495 (finding that the district judge properly exercised discretion in granting a downward departure to a sentence of five years of probation with six months community treatment based on consideration of factors including the detrimental

6

effect defendant's incarceration would have on her children and grandchild).

In addition, the infant's basic biological need to bond with its mother in the period following birth, and its need for breast feeding and other nurturing, support a downward departure or other sentencing modification to allow for this bonding to take place. *See Greer*, 375 F. Supp. 2d at 794 n.4 (citing *Alternative Sanctions for Female Offenders*, 111 Harv. L. Rev. 1921, 1930-31 (1998)).

All of the cases cited herein where the defendant's parenting responsibilities were taken into account also cited the nonviolent and minimally culpable nature of the offenses, and noted that the defendant's other characteristics also supported a reduced sentence. *See Pokuaa*, 782 F. Supp at 748 (noting that it was the defendant's first offense, she acted only as a courier in smuggling 92 grams of heroin into the country, and she accepted responsibility); *Greer*, 375 F. Supp. 2d at 793 (defendant who pleaded guilty to using a telephone to facilitate drug trafficking "did not sell cocaine but was the girlfriend, sister and cousin of men who did" and only helped them in "relatively small ways," and "nothing in defendant's background or character suggested she was dangerous"); *Pena*, 930 F.2d at 1495 (defendant had no prior record of drug abuse or convictions, had held long-term employment, and posed no threat to the public). Ms. Sandhu's situation is similar to all of these cases in that her offense is nonviolent, is out of character viewed in light of other indicators in her history and circumstances, such as her level of education, stable employment history, and lack of any other law enforcement contact in her past, and the PSR determined she had a relatively low level of culpability for the charged offense.

Ms. Sandhu's responsibilities as mother of a newborn and a five year-old child who reside in Canada suggest that a departure and/or sentencing variance is appropriate in this case. A punishment that minimizes Ms. Sandhu's sentence of incarceration and maintains her close contact with her five year-old son and her newborn infant will best effectuate the

7

statutory purposes of sentencing.

### VI. Ms. Sandhu's Personal Circumstances Should Be Given Consideration

Courts have considered a defendant's personal history and life tragedies as mitigating circumstances during sentencing. *See, e.g.*, *U.S. v. Collington*, 461 F.3d 805 (6th Cir. 2006) (upholding downward departure from sentencing guidelines where defendant's father was murdered when he was nine years old and his mother died soon thereafter); *U.S. v. Castillo*, 2007 WL 582749 (S.D.N.Y. 2007) (finding below-guidelines sentence warranted, in part, due to the depression, anxiety, and pressure defendant experienced at young age caused by the loss of both parents and the resulting financial and emotional family commitments he faced).

Here, Ms. Sandhu's personal history and tragedy suffered at an early age warrant consideration in determining a minimally sufficient sentence. When she was seven years old, Ms. Sandhu tragically lost her father, grandfather and uncle, who were murdered in front of her family home in India. Shortly afterwards, Ms. Sandhu immigrated to Canada with her mother and two sisters. Ms. Sandhu's tragic personal history should be given consideration in determining a minimally sufficient sentence in this case.

### VII. Ms. Sandhu's History and Characteristics, in Particular Her Lack of Any Criminal History, Indicate That She Poses a Reduced Risk of Recidivism

United States Sentencing Commission data support the conclusion that Sandhu poses a reduced risk of recidivism, as compared with other category I offenders, and suggest that a sentencing variance that minimizes Ms. Sandhu's sentence of incarceration is appropriate in this case. *See e.g.*, U. S. Sentencing Comm'n, *Measuring Recidivism*: *The Criminal History Computation of the Federal Sentencing Guidelines* 16 (May 2004), *available at* http://www.lb5.uscourts.gov/ArchivedURLs/Files/08-10643%281%29.pdf (hereinafter "Measuring Recidivism"); U.S. Sentencing Comm'n, *Recidivism And The "First Offender"* (May 2004), *available at* http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_First_Offender.pdf (hereinafter

8

"First Offender Report"). The Guidelines deem "first offenders" generally less culpable and less likely to re-offend than all other offenders. *See First Offender Report* at 1. However, the Guidelines broadly define first offender status. *Id*; *see also* U.S.S.G. §§ 4A1.1. The Commission, in fact, concedes it can narrow the definition to better identify those offenders who prove least culpable, least likely to re-offend, and therefore most deserving of the leniency recommended by 18 U.S.C. § 994(j). *First Offender Report* at 1. In an on-going effort to do so, the Commission collected data on three categories of first offenders: those with no criminal history points and (i) no prior arrests, (ii) prior arrests but no prior convictions or (iii) prior convictions counted under U.S.S.G. § 4A1.2(c)(2) only. *See id*. at 5. The Commission denominated the groups A, B and C, respectively. *Id*. It drew the following conclusion from its analysis:

> From both culpability and recidivism risk perspectives, group A offenders with no prior arrests, most strongly meet the conceptual definition of the first offender category. Offenders in group A have had no recorded contact with the criminal justice system prior to their instant federal offense. Moreover, as indicated by their extremely low recidivism rate of 6.8 percent, they are easily the most empirically identifiable group of guideline federal offenders who are the least likely to re-offend.

*See id*. at 17. Ms. Sandhu had no contact with the criminal justice system prior to commission of the instant offense—she, therefore, falls within group A. *See* PSR at ¶¶ 53-57. Accordingly, United States Sentencing Commission data also identify Ms. Sandhu as among the offenders who are least likely to reoffend.

Other United States Sentencing Commission data beyond her first offender status reinforce the conclusion that Ms. Sandhu presents a very low likelihood of recidivism. The criminal history measure of the guidelines estimates the likelihood of recidivism based on two offender characteristics: prior convictions and prior terms of incarceration. *See* U.S.S.G. § 4A1.1. *See also* Paul J. Hofer & Mark H. Allenbaugh, *The Reason Behind the Rules: Finding and Using the Philosophy of the Federal Sentencing Guidelines*, 40 Am. Crim. L.

9

Rev. 19, 24 (2003).  The United States Sentencing Commission's 15 Year Report, however, concludes that the measure's predictive power would improve if it incorporated additional offender characteristics.  *See Measuring Recidivism* at 16.

Recidivism rates decline consistently as age increases.  *Id.* at 12, 28.  Offenders in criminal history category I under the age of 21 recidivate at a rate of 35.6%, and offenders between the ages of 21 and 25 recidivate at a rate of 29.1%.  *Id.* at 28.  In comparison, offenders in criminal history category I who are 31-35 years old recidivate at a rate of 14.6%.  *Id.*  Sandhu is now 31 years old.  PSR at ¶ 58.

Educational attainment also correlates with recidivism rates.  *See Measuring Recidivism* at 12, 29.  Criminal history category I offenders who have not graduated from high school recidivate at a rate of 31.4%.  *Id.* at 29.  Offenders in the same criminal history category that have completed high school recidivate at a lower rate of 19.3%, more than 10% less than those who have not graduated from high school.  *Id.*  Criminal history category I offenders who have some college recidivate at a rate of just 18%, and those that are college graduates recidivate at a rate of 8.8%, which is 22.6% less than those without a high school education, 10.5% less than those with a high school education, and 9.2% less than those with some college education.  *Id.*  Sandhu has earned two Associate's Degrees in cosmetology-related fields from the Blanche MacDonald Centre in Vancouver, British Columbia.  PSR at ¶ 67.

Finally, marital status correlates with recidivism.  *See Measuring Recidivism* at 12, 29.  The recidivism rate for criminal history category I offenders who have never married is 22.7%.  *Id. at* 29.  Offenders in category I that are divorced recidivate at 9.8%, a rate 12.9% less than offenders that never married.  *Id.*  Category I offenders that are divorced recidivate at the same rate as offenders in the same category that are legally married.  *Id.*  Sandhu was divorced in 2014.  PSR at ¶ 59.

Sandhu's history and characteristics, in particular her status as a true first offender with no prior criminal justice contacts, indicate that she poses a reduced risk of recidivism, and reinforce the suggestion that a sentence that minimizes her term of incarceration is appropriate in this case.

**VIII.  Conclusion**

For all the foregoing reasons, Defendant respectfully requests that this Honorable Court impose a reduced or modified sentence in the above-styled case that minimizes Ms. Sandhu's term of incarceration in the interests of justice and the statutory purposes of sentencing.

Defendant respectfully suggests that a sentence of probation would best serve the purposes of sentencing.  In the event that the Court is inclined toward a sentence of probation, counsel for Defendant has researched the issue and contacted the relevant government entities in the United States and Canada and has been informed that probation can be transferred in either of the following ways:

1) A sentencing court may initiate the transfer by explicitly incorporating in the sentence that the probation is to be served in Canada, and then initiate the process of transferring official jurisdiction to the Crown.

2) The U.S. Probation Office may initiate a request for transfer with the British Columbia probation office if the transfer is not initially part of the sentence.

Finally, Defendant respectfully suggests that, even should her sentence of probation be supervised by the U.S. Probation Office for the Eastern District of Missouri, an Order be entered allowing her to reside at her home in Canada.  Counsel offers that it has been his past experience that supervisees who pose low flight risks and have compelling reasons to travel internationally are often permitted leave to do so while under sentences of probation and pretrial supervision, despite the existence of opportunities to escape supervision, and suggests

that the risks of Ms. Sandhu's being supervised while residing at her home in Canada are comparably low and justified by her personal history and past compliance with all terms of pretrial supervision.

                Respectfully submitted,

                ROSENBLUM, SCHWARTZ, ROGERS & GLASS, PC

By:    /s/ John P. Rogers_____
       JOHN P. ROGERS, #38743MO
       Attorney for Defendant
       120 South Central Avenue, Suite 130
       Clayton, Missouri  63105
       (314) 862-4332/Facsimile 862-8050
       jrogers@rsrglaw.com

**CERTIFICATE OF SERVICE**

     I hereby certify that on July 24, 2015, the foregoing was electronically filed with the Clerk of the Court, to be served upon Mr. Andrew J. Lay, Assistant United States Attorney, by operation of the Court's electronic filing system.